I'm pleased to announce we have an admission this morning. Mr. Green, will you come forward? I'm pleased to move the admission of Scott Garrett Green, who is a member of the bar in good standing with the highest court of New York. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. Let me say also that Mr. Green has served as my law clerk with distinction over his stay with us, and I am delighted that he is on the path to what I trust will be gainful employment in the future. So will you approach the clerk who will administer the oath? Thank you. Now we shall proceed. I must announce with regret that Judge O'Malley, on very short notice, is unable to be with us today. She will listen to the arguments as soon as she is as able and will participate fully in the further events. So as you present your arguments, we will try and represent her viewpoint in our interaction with you as well. Okay. So the first argued case this morning is number 17-2072, Washington against the Department of Defense. Mr. Hunter. Yes. May it please the court. My name is Scott Hunter. I'm an attorney from Fairhope, Alabama. My good friend and my co-counsel, Ed Smith, is still back home today, but I'm here today with Ms. Washington, who is in the gallery above right over my left shoulder. I want to give you kind of an update. As you know, there's a pending motion to transfer that's included in this case. There is the EEO appeal is before the Southern District of Alabama. There is currently a stay that was issued. There was a stay issued by Judge Terry Moore pending. We advised the court that the motion to dismiss was put up as part of the briefing. Is Judge Moore in the Southern District of Alabama? Yes. He was a magistrate in the Middle District for a while. He was just appointed six, eight months ago to the Southern District. That case has stayed pending your Honor's decision on the motion to transfer. What is your theory for why this case has to be transferred? Ms. Washington has had her EEO complaint during this time. She's also had the MSPB at this time. During the briefing, she had a different trial lawyer than me handling her district court case. During the appeal, she gets a right to sue letter from the EEO and says, here you can proceed with your racial discrimination claims and your others in district court. I felt that it was appropriate for me to advise the court that there's still this racial issue out there. I may not be remembering accurately and maybe the government can clarify this, but I think in the government's response in its brief on this, it makes a point something along the lines of the actual subject of the discrimination charge complaint that's in the Alabama court is not the removal. It is rather the issuance of the notice of proposed removal. Therefore, even if Ms. Washington has a discrimination complaint, it's not actually a discrimination complaint about the removal. Therefore, the removal case, which is what this is, belongs here as it was properly transferred, indeed requested to be transferred from Georgia. My understanding is the EEO determination includes a reference to the fact that she had been terminated. In that 2018 report that was the nexus of her district court lawsuit, it references the fact that she was terminated. The termination became part of the EEO investigation along the way. The lawsuit that was filed in district court by a fellow named Ronnie Williams includes the reference to the fact that the EEO mentions the termination in their findings. That's where we are. I felt it was appropriate to bring it to your honor and to the court. That's where we were. I initially was started with this to do the merits. That's where I am at this. If you don't have any other questions on the transfer right now, I'm going to go to the merits. With regards to Ms. Washington, she's an auditor, a civilian auditor at the Department of Defense. Before she worked in Mobile, she did a year of volunteering to do this job in Baghdad for a year. At some point, they tell her, you need to move to Smyrna, Georgia. About a six and a half hour drive from Mobile. We're going to talk a lot about what's in the record. You've got to look at what's not in the record. They're saying she never moved to Georgia. They're saying she never did this. She never missed a day of work in Smyrna, Georgia. She never missed a TDY assignment except for the assignment where she was in Jacksonville, Florida and had a medical emergency and had to have emergency surgery and was out for about three months. What is your response to these claims? They have quite a strong list of concerns that have been raised. Yes, Judge. The main thing is, of the several issues that they're raising, and mind you, in my reading of the record, some of the things that the union rep was arguing about didn't quite dovetail with what was being brought about by the government at the time, or the department at the time, because up until they were coming into the hearing, they thought they were arguing, they were nitpicking the regulations. If you look at the pretrial information and everything, they were all based off of what they thought was the inaccuracy. They thought they were just coming in and arguing almost like a CBCA style, it fits under this reg, but not that reg. When they get there, they say, oh well, this is actually more of a falsification. And they kind of change it midstream. Of the things that they found that they said she falsified documents, they claimed that metadata proved it. And we looked at her computer, and there's metadata. All he did was right click on properties. It says the document was created that day. Mr. Fonterra, the investigator, isn't a forensic scientist, isn't a forensic IT expert. He's their PI. He's the same guy that drove to Mobile and took photographs of a parked car in a driveway. Did you have the opportunity at the hearing to put on evidence about why this metadata didn't really establish? She tried, and the department objected to her trying to rebut this evidence. She tried to show them that certain software, it says it was created, and what had happened when she had to, in order to obtain these reimbursements, she has to put these documents onto her work computer. The requests for payment have to come from a .gov email. She can't do it from her personal address. So she has to get these documents onto her computer, save it on her computer, and then upload it. And when she tried, let me find the page. In the records, she tried to show them, she said, no, look, here's what happens when you upload a document onto a .gov computer. They objected and said, well, she's not an expert. But everything, and I agree that when you're discussing something like metadata, y'all... You say they objected. You're saying that she was not permitted to present this argument? Absolutely. That... She was absolutely not allowed to do that. Were you representing her in this? No, she had a union rep. Mr. Mitchell was the union rep. And so I came into this case very, very late. And so I came in just enough time to file the opening brief. And so the... I've got it written down. It does seem strange that there were no original documents, as far as we could tell, in the record that was presented to us. They were, to the extent that... And for one of the documents, it was a document they said she forged, but they even admit the purported author, if they say it was forged, the purported author was Ms. Washington. It came from a document that she had prepared. And so one of the documents was from a business courtyard manor. She and her now ex-husband were both... They were both co-owners of this courtyard manor, so how can you forge your own document? I mean, I can't forge my own signature, either. It's my signature, it's not. It was a document... It was at page... The supplemental index, 448 and 449. And I'm at five minutes left, so I'm going to reserve the rest of my time. Yes, all right. Thank you. Mr. Lyons, on this particular issue, what is the government's response to the argument that she wasn't permitted to present her evidence rebuttal? She was allowed to present her argument that when you upload a file to a computer, the file gets the date it's uploaded. She attempted to introduce evidence that she could manipulate the clock on a computer to create a false date. That's the evidence that the judge excluded. And in the initial opinion, the judge notes, well, if, in fact, the issue was you uploaded the moving receipt on a later date, there's no email from the moving company for that later date. So if that's the issue, you got it on a later date, where's the underlying evidence to support that? The whole issue here of metadata is really something of a red herring. As counsel just stated in his argument, all Mr. Fonterra, the investigator, did was right-click on a document's properties. This isn't specialized knowledge for which expert testimony is necessary. He just looked to see. He reported what he found on her computer. Yes, Your Honor. But we're told that there were other considerations. Yes, he looked, he said, and he found the dates. The fact that those dates don't line up with underlying emails, that there's no receipt of payment, there's no proof of payment, and that Ms. Washington admitted that she never actually moved to the Atlanta area, never set up permanent residence there. She was in the Tennessee mountains or living with a brother somewhere. She could not remember the address. That all shows the substantive evidence that proves, that justifies the decision upholding the removal here. Can I just ask this about the metadata issue? I certainly see in the blue brief an argument that the administrative judge erred in allowing the testimony by the non-expert investigator about the meaning of the information that you get when you right-click, whether that's date of document on the computer or date of creation of document, which might have been earlier, obviously. I'm not sure I see an argument, and I guess I want you to tell me if there is an argument in the blue brief that the AJ erred in denying her ability to make her own testimony about the meaning of metadata. As I read the argument Ms. Washington makes, she is complaining that the investigator's testimony was allowed, not that her testimony was excluded. The problem in her view is that Mr. Fonterra should not have been allowed to testify, and that's why our response was, well, at the time, you didn't object. At the time, you had actually listed, Ms. Washington actually listed him as a witness she intended to call, and that fundamentally it's not expert testimony. So one could read, I suppose, generously the argument. It would require a very generous reading to say the argument that was made in the briefing is that Ms. Washington should have been allowed to introduce this testimony that she hadn't previously identified, that she could change the clock inside a computer to create a false state. Can you address the transfer question and the relationship between the new district court action, the one in Alabama, and this appeal from the board decision? Yes, Your Honor. We think very clearly the court has jurisdiction. The Alabama case is an appeal from the EEOC determination. The EEOC determination, during the pendency of that matter before the EEOC, Ms. Washington added a claim about her proposed removal, not her termination, her proposed removal, and you can see that at the supplemental appendix at 61. In its decision— You say it's not a termination appeal, but in fact, doesn't it arise from this termination action? No, Your Honor, because the EEOC proceeding arises from various actions that Ms. Washington found adverse in advance of even the proposed termination, and then she amended it to add the proposed termination. She never amended it to include her termination. We don't think she could have. That was already in front of the MSPB. But in any event, you can see that from the EEOC's actual opinion, which counsel referenced. It's in the supplemental appendix beginning at 512. It identifies four claims that Ms. Washington makes, and three of them don't have to do with any part of the removal, and claim four is identified as proposed removal. That's consistent with what she amended her EEOC petition to assert. That's what the EEOC considered. So the Alabama—to get back to your question, Your Honor— the Alabama matter comes up from the EEOC. It has no impact on what was done before the MSPB. The MSPB matter was not a mixed case, and this case before this court is from that matter and is not a mixed case because it wasn't a mixed case below. It cannot be—this case cannot be turned into a mixed case by a subsequent amendment of an unrelated district court complaint. We think, therefore, very clearly the court has jurisdiction, and this matter should remain here. We're also, frankly, concerned that if, in essence, all one needs to do to create a mixed case is say the word discrimination and then waive it or put in no evidence of it, then, in essence, every case will become a mixed case because every savvy plaintiff will say the word mixed case or say the word discrimination in order to be able to then choose their forum where they proceed. We don't think that's what the law requires, and we don't think that's what the court should find here. We think very clearly the court has jurisdiction. We think very clearly the host of evidence presented to the MSPB, setting aside the metadata issue, the lack of any receipts, the admission of non-movement, the various statements that were introduced into the record where Ms. Washington admitted that she had never left Alabama. There was a host of evidence. We set it forth in our brief. We've put the entire transcript there. There's far beyond the very limited standard of substantial evidence to support the decision below. So for those reasons, Your Honors, we think very clearly the court has jurisdiction, the decision below was correct, and we ask that it be affirmed. Well, all right. We will consider the merits. We still need to think about her, the fact that she didn't waive the discrimination claim. But would you comment further on the merits? Further on the merits? Yes, Your Honor. There were two charges that the MSPB upheld, one of falsification, one of conduct unbecoming. There were four specifications under the falsification charge, obviously, or as the law, is only one of those needs to be supported by substantial evidence. The issue that's been raised by counsel is that she didn't have a fair opportunity to respond to these various charges and that they were not adequately supported by the evidence. Yes, Your Honor, but the record doesn't support that position. I'll go through each of the specifications. The first one was the false rental payment, where there were $35,000 in rental payments. Ms. Washington supported that by pointing to an alleged bill. As we've talked about extensively, there's the bill, the metadata showing it's not the right date. But set aside that it's not the right date, there's no underlying payment. She couldn't put that in evidence. She also admitted that the lease itself doesn't justify, doesn't give any basis for imposing this fee upon her. This is the lease termination fee? Yes, Your Honor. The second specification under the falsification charge had to do with the moving furniture, the moving expense of furniture of about $10,000. Again, there's a receipt on a computer. The metadata shows it's at the wrong date. But again, set aside the metadata. There's still ample evidence. There's no underlying payment. There's no bill of lading. There's allegedly 20,000 pounds of materials moved, but Ms. Washington in a bankruptcy proceeding said she had only $2,000 worth of household items. There's the fact that she has what the initial decision, I believe, calls a nomadic existence. She doesn't have anywhere, she doesn't set up a residence in Atlanta. So where did this 20,000 pounds of materials move to if she's staying in hotel rooms and with a brother-in-law or in the Tennessee mountains? That is substantial evidence. It's evidence that would support the reasonable conclusion that the claim of moving, of this moving expense, was not accurate. And I gather it's your view that that evidence is substantial even if one puts aside the interpretive question about the meaning of the metadata. Absolutely, Your Honor. As soon as the question is raised of, you say you moved, show me the check stub or the bill of lading or some evidence you paid this, and it's not there, nor was a witness from the moving company called who could have come in and said, oh yes, that didn't happen. No, we think even without the metadata issue, there's substantial evidence here. The third issue, the third specification had to do with living expenses where Ms. Washington claimed living expenses and couldn't prove that she had actually been in the Atlanta area. She said that she was able to show a receipt for two days of hotel stays, but these were many, many days of living expenses. She had no proof of having been in the Atlanta area. She said she'd stayed in hotels for two years, but couldn't identify any documentation to support that. In fact, again, at the hearing, admitted she never set up permanent residence in the Atlanta area. What, if anything, did the administrative judge or the full board say about Mr. Hunter's point that during a couple of years,  when she was supposed to be in Atlanta? Which would be pretty hard to do if she was in Mobile. Well, unfortunately, it appears it wasn't that hard. She was on a four-day-a-week work schedule. Two of those days were telework. So now we're down to two days. We're talking here about a seven-month period. It's not years. And during three months of that, apparently there was some sickness issue, so she wasn't in anyway. It's of note that the investigator, Mr. Fonterre, came to her office to interview her on one of the days she was supposed to be there. She wasn't there. Now, certainly she would have leave and be entitled to take it. How much of this, of what you're now saying, is actually in the A.J.'s opinion or the board's opinion as opposed to your describing what the underlying evidence is? Certainly. The four-day-a-week work schedule, I believe, is in the A.J.'s opinion. The investigator coming the first time is in the testimony. It's in the supplemental appendix, but it's not in the opinion. The issue, frankly, Ms. Washington didn't argue, this all must be true because nobody charged me with not showing up for work. So we don't think that would have worked as a defense for the reasons that the evidence shows, but that's not an issue she put in front of the administrative judge. If she had wanted to make that argument, she needed to raise it there or at least to the full board to say, oh, you got it all wrong. I was at work every day. She didn't make that point. So that isn't fairly, honestly, that shouldn't be considered now. It wasn't raised below. Judge Newman, you asked me to go through the remaining specifications. The fourth one under the first charge has to do with making a false representation of having moved. She admitted that she hadn't moved. And then the second charge was for conduct unbecoming, and this was for making false documents using government records, using government equipment. This is a credibility challenge. Mr. Fonterra said these don't appear to be correct. They don't appear to have the right dates. There's no underlying documents. Ms. Washington said they're correct. They're what happened. The administrative judge made a credibility determination  He ruled in that way, having viewed the evidence in the first instance, and that is substantial evidence to support that charge. So for those reasons, Your Honors, as we said, we think the court has jurisdiction, and we'd ask that the decision below be affirmed. Thank you, Mr. Lyons. Thank you. Mr. Hunter. Thank you. I'll try to cram 12 minutes into this 450. With regards to, with respect to what he's talking about, they charged her with, the actual charge is, I'm going to get it, and they said that she misused her work computer for personal gain, or for personal reasons. The documents they point to are the documents that she submitted to the government for reimbursement. My reading of what misuse of the work computer, if she had run payroll for Courtyard Manor off of that, that would be misuse. But she's, the only documents they have are documents that if she's going to submit a receipt, it has to be on her work computer. And so, they're arguing that doing what they tell her to do is a misuse of the work computer, and it just doesn't stick. With regards to, with regards to charge one, what he's talking about, he says, well, Judge, even if you ignore the metadata, look at all this other stuff about her. One, she didn't, she never confessed that she, she never said that she had not moved away from Mobile. She didn't say that. They said that she had a nomadic existence. Well, again, her nomadic existence was all in the Atlanta area. Yes, sometimes she did stay in a hotel because her brother-in-law's house, she had to stay in her brother-in-law's house because she was just going through a divorce, and she, around the time of the move, she's going through a divorce, her four-day work week included two weeks where she's doing a TDY in Jacksonville, in Texas, in London, looking at Rolls-Royce building jet engines. Those kinds of things that they had her doing, on top of the fact that in the seventh month span, she spent three of it recovering from emergency surgery. So, she never really had time to set up a permanent address. But with, so she, at the time, most of the time she was living with her brother-in-law in Ellenwood, Georgia, which, if you don't know the geography of Atlanta, is the southeast corner of the Atlanta metro area. And Smyrna is in the northwest corner. As someone, I may have driven in Atlanta traffic more than anybody in this room, and if you don't leave at 3.30 in the morning, she wouldn't be in Smyrna by 8 o'clock from near Stone Mountain. And so, sometimes she would stay, there was a base a mile, mile and a half from her station, and there was a courtyard there. That's the receipt she showed was for the courtyard on the base. And so, sometimes she would stay on her two days, instead of driving all the way back to her brother's in between her two work days, she'd stay at the hotel in between. And again, part of the time, for her first seven months, they're complaining she wasn't there. She had use-it-or-lose-it time that she used. That's in the record. It is in the record on the transcript about her doing the four-day work week. But she had use-it-or-lose-it time. She'd accrued all these hours working in Baghdad. She had to use before it went away. And then she had the emergency surgery. We're talking about just a matter of a few days. They're saying, aha, you didn't move. And something else to remember is, the record shows they started this investigation in December of 2013, and she didn't submit these documents until June of 14. So, they were just looking for a reason to get rid of her. And then they came up with this metadata stuff and said, aha, we got it. With regards to... Did she provide, in the record, did she provide an explanation of no original invoices from the moving company, from courtyard... The old man died. No checks, or bank payment records, or credit card company payment records? They didn't bring, because the old man died. The old man that ran the moving company died. That kind of... There are emails before the move where they negotiated it. There's emails in the record where her husband was negotiating with this company. But afterwards, the old man died, and it was a one-man outfit. I got 20 seconds. One of the things else I'm going to mention is, they mention about the bankruptcy and about her $2,200 and moving 20,000 pounds of stuff. She had just gone through a divorce at the same time she's doing all this stuff, and so half of that stuff was David Washington's. And I got three, two, one, so I'm done. Thank you. Thank you. Thank you both. The case is taken under submission.